**No. 26-7049**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

DONALD J. TRUMP, et al.,
*Defendants-Appellant,*

v.

BARBARA J. LEE, et al.,
*Plaintiffs-Appellees.*

On Appeal from the United States District Court
for the District of Columbia
No. 21-CV-00400
Honorable Amit P. Mehta

# BRIEF OF AMICI CURIAE STATE OF WEST VIRGINIA AND 13 OTHER STATES IN SUPPORT OF DEFENDANT-APPELLANT DONALD J. TRUMP

JOHN B. MCCUSKEY
*Attorney General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
(304) 558-2021
mwilliams@wvago.gov

MICHAEL R. WILLIAMS
*Solicitor General*
*Counsel of Record*

CALEB B. DAVID
*Deputy Solicitor General*

MATTIE F. SHULER
*Assistant Solicitor General*

*Counsel for* Amicus Curiae *State of West Virginia*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), amici curiae State of West Virginia and 13 other States submit this certificate as to parties, rulings, and related cases.

### A. Parties and Amici

Except for amicus curiae America First Legal Foundation, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Opening Brief for the United States.

### B. Rulings Under Review

The rulings under review are identified in the Opening Brief for the United States.

### C. Related Cases

The related cases are identified in the Opening Brief for the United States.

/s/ Michael R. Williams
Michael R. Williams

*Counsel for Amicus Curiae*
*State of West Virginia*

Dated: September 9, 2026

## TABLE OF CONTENTS


Table of Authorities .................... ii

Introduction and Interests of *Amici Curiae* .................... 1

Summary of Argument .................... 4

Argument .................... 6

I. The District Court Contorted The Incitement Test .................... 7

A. Incitement requires intent .................... 8

B. Risk awareness isn't enough .................... 12

C. Plausibility requires more .................... 16

II. "Fight" Is The Ordinary Vocabulary of American Politics .................... 19

III. The District Court's Decision Will Chill Speech .................... 23

IV. President Trump is Entitled to Immunity .................... 27

Conclusion .................... 32

Certificate of Compliance .................... 34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 17

*Bible Believers v. Wayne Cnty.*,
805 F.3d 228 (6th Cir. 2015) ... 16

*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) ... 31

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ... 7, 8, 9, 10

*Clinton v. Jones*,
520 U.S. 681 (1997) ... 28

*Counterman v. Colorado*,
600 U.S. 66 (2023) ... 3, 7, 9, 13, 14, 22, 23, 24

*Draego v. City of Charlottesville*,
No. 3:16-CV-00057, 2016 WL 6834025 (W.D. Va. Nov. 18, 2016) ... 16

*FEC v. Wis. Right to Life, Inc.*,
551 U.S. 449 (2007) ... 8

*Herceg v. Hustler Mag., Inc.*,
814 F.2d 1017 (5th Cir. 1987) ... 19

*Hess v. Indiana*,
414 U.S. 105 (1973) ... 7, 9, 10

*Lee v. Trump*,
No. 21-cv-00400, 2026 WL 880161 (D.D.C. Mar. 31, 2026) ... 13, 14, 30

*Million Youth March, Inc. v. Safir*,
63 F. Supp. 2d 381 (S.D.N.Y. 1999) ... 11

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 6, 23, 24, 25

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .......... 6, 10, 11, 12, 13, 16, 19, 24

*Nicholas v. Wallenstein*,
266 F.3d 1083 (9th Cir. 2001) .......... 8

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) .......... 27, 28, 29

*Nwanguma v. Trump*,
903 F.3d 604 (6th Cir. 2018) .......... 15, 18, 19

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 6, 24

*Terminiello v. Chicago*,
337 U.S. 1 (1949) .......... 26

*Thompson v. Trump*,
590 F. Supp. 3d 46 (D.D.C. 2022) .......... 2, 8, 11, 12, 13, 15, 18

*Trump v. United States*,
603 U.S. 593 (2024) .......... 28, 29, 30, 31

*United States v. Al-Timimi*,
164 F.4th 292 (4th Cir. 2026) .......... 17

*United States v. Grace*,
461 U.S. 171 (1983) .......... 6

*United States v. Miselis*,
972 F.3d 518 (4th Cir. 2020) .......... 12

*United States v. Schwimmer*,
279 U.S. 644 (1929) .......... 26

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 19

*United States v. Texas*,
599 U.S. 670 (2023) ....................................................................................25

*Watts v. United States*,
394 U.S. 705 (1969)......................................................................................19

**Constitutional Provisions**

U.S. CONST. amend. I ..................................................................................6

**Other Authorities**

Associated Press,
*Just Begun to Fight, Says La Follette*,
N.Y. TIMES, Nov. 6, 1924.............................................................................21

Eugene Kiely,
*Obama, Guns and "The Untouchables,"*
FACTCHECK.ORG (Jan. 14, 2011),
https://perma.cc/V4DA-M9UJ .......................................................................22

*Former President Biden, Gov. Wes Moore and Others Speak at Maryland Democratic Party Gala*,
C-SPAN (June 27, 2026), https://tinyurl.com/cstkbsaa...............................22

Frederick Douglass,
The Significance of Emancipation in the West Indies, Address at Canandaigua, N.Y. (Aug. 3, 1857), *in* 3 THE FREDERICK DOUGLASS PAPERS, SERIES ONE 183 (John W. Blassingame ed., 1985) ...............................................................................................20

*I've Been to the Mountaintop*,
MARTIN LUTHER KING, JR. RSCH. & EDUC. INST.,
https://perma.cc/QEB3-N2N3 (last visited Sept. 3, 2026) ...........................26

John Inazu,
*Incitement, Enthusiasm, and the Dangers of Negligent Protest*,
6 J. FREE SPEECH L. 801 (2025) ........................................ 26

Katherine Shaw,
*Beyond the Bully Pulpit: Presidential Speech in the Courts*,
96 TEX. L. REV. 71 (2017) ........................................ 29

LEND ME YOUR EARS: GREAT SPEECHES IN HISTORY
(W. Safire, ed., 2004) ........................................ 21

Letter from Thomas Jefferson to William Stephens Smith
(Nov. 13, 1787), *in* 12 THE PAPERS OF THOMAS JEFFERSON 355
(Julian P. Boyd ed., 1955) ........................................ 20

Malcolm X,
*The Ballot or the Bullet*, *in* POLITICAL THOUGHT IN THE UNITED STATES: A DOCUMENTARY HISTORY 392
(Lyman Tower Sargent ed., 1997) ........................................ 21

Timothy Zick,
*The Costs of Dissent: Protest and Civil Liabilities*,
89 GEO. WASH. L. REV. 233 (2021) ........................................ 25

*Transcript: John McCain's Speech*,
NPR (Sept. 4, 2008, 10:15 p.m.), https://perma.cc/4CVH-4A3D ................. 22

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*

Americans have always talked about politics through the language of combat. A candidate "fights" for her district. One party launches a "war" on competing ideology. Politicians never "surrender" to special interests. And every four years, both nominees close their conventions in "battleground" states. Even when the "gloves come off," legislation is "do or die," and politicians "take aim" and "fire back," no one thinks this language means that officials are about to start hurting one another.

But when President Donald J. Trump used this same kind of language, opponents accused him of inciting a riot. On January 6, 2021, President Trump delivered a speech on the Ellipse about the integrity of the 2020 presidential election and the congressional certification slated to take place later that day. After the speech, in another common act of political demonstration, rallygoers marched to join protestors already at the Capitol. Unfortunately, some protestors then breached security barriers and entered the Capitol building.

Eleven members of Congress and two Capitol police officers sued President Trump for what happened. They say the President and others conspired to prevent Congress from certifying the election results. And they insist the President used his speech to incite a riot to advance the conspiracy.

The district court found that the President's speech "plausibly crossed the line into unprotected territory." *Thompson v. Trump*, 590 F. Supp. 3d 46, 116 (D.D.C. 2022).

The district court was wrong to endorse the challengers' novel theories. Incitement requires a speaker to intend to produce imminent lawless action. Yet President Trump's speech didn't show that intent. He told the crowd what he believed: voter fraud had happened, and the Vice President could "send [the election results] back to the states to recertify." *Thompson*, 590 F. Supp. 3d at 103. And he closed his speech with typical political language: "We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore." *Id.* at 104. At the same time, he stressed how the crowd should go to the Capitol "to *peacefully* and *patriotically* make [their] *voices* heard," *id.* (emphasis added), and later emphasized on Twitter that there should be "no violence."

Even the district court agreed that President Trump's speech "did not explicitly encourage the imminent use of violence or lawless action." *Thompson*, 590 F. Supp. 3d at 115. It thus strained to fashion evidence of intent from outside circumstances: what President Trump supposedly knew about the crowd and what some rallygoers did once they reached the Capitol.

Yet that logic turns the Supreme Court's incitement test on its head, turning it into a hindsight-driven, strict-liability affair. And in the process, the district court opened up all sorts of political advocates to liability for speech that Americans have always used—and that the First Amendment has always protected.

The amici States write to fight for First Amendment rights. Their elected officials and political organizers regularly use loaded language to instigate meaningful political change. So do the citizens who fill their statehouse galleries, march on their capitol steps, and picket outside their workplaces. Making a combat metaphor actionable whenever violence follows will chill speech. And threatening liability against *the President* in such circumstances is particularly pernicious. Our nation's Executive must be free to perform his work—which includes using the presidency's bully pulpit—without fear that a lawsuit will result anytime some unexpected event follows.

The Court should reverse. The district court was too quick to allow for the punishment of core political speech because it found the rhetoric it employed might strike some as distasteful. The "First Amendment stakes" are highest in such cases, *Counterman v. Colorado*, 600 U.S. 66, 86 (2023)

(Sotomayor, J., concurring in part), and the court incorrectly dismissed the role of protected, presidential, political speech like this.

## SUMMARY OF ARGUMENT

**I.** The district court contorted the incitement test. Before any sort of incitement liability can attach to speech, a plaintiff must show that the speaker's words were intended to produce, and likely to produce, imminent lawless action. The district court acknowledged that President Trump's speech didn't explicitly encourage violence or lawless action. But the lower court determined it could infer an intent to incite from the President's supposed knowledge that some crowd members had violent tendencies. It drew this inference by reasoning backwards: President Trump spoke despite the alleged risk, and some rallygoers later engaged in violence. That logic substitutes risk awareness for intent—creating a lax incitement standard never endorsed by the Supreme Court. It also ignores the only express instruction in the President's speech: to "peacefully and patriotically make your voices heard." That statement reveals President Trump's intent. And it renders any other inference implausible.

**II.** Political speech is often disagreeable—even severe. Politicians and political advocates have used combat metaphors like "fight like hell" since

before the Founding. But none of them have called for literal battle. Instead, they've expressed a rallying cry: "Don't quit." Today, "fight" rhetoric is common political parlance. The district court's lax standard risks turning ubiquitous political language into open-ended liability.

**III.** Even just the risk of liability chills speech. The district court's lax standard exacerbates the concern. No speaker can predetermine that his speech is truly free when it's viewed through a prism of crowd-based risks and how a crowd might react. Unable to do the math up front, people will simply speak less. That chilling effect reduces speech rights and affronts the Constitution.

**IV.** Even if the Court finds plausible incitement, President Trump is entitled to immunity. The president holds a unique position in our constitutional order. He alone acts as the Executive. So courts must give him breathing room to do his job, lest separation-of-powers concerns arise. That's why the Supreme Court imposed only a low bar to access official-acts immunity. President Trump needed to produce only evidence sufficient to show his speech could reasonably be understood to be an official action. He cleared the hurdle with room to spare.

## ARGUMENT

The First Amendment protects the people's right to free speech. U.S. CONST. amend. I. "[S]peech on matters of public concern ... is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (cleaned up). And the Free Speech Clause's protection is at its maximum when "expressive activities" are carried out in "public forums." *United States v. Grace*, 461 U.S. 171, 177 (1983). So courts should zealously safeguard speech on matters of public concern in a public forum.

President Trump stood on stage at the Ellipse and delivered a speech about election integrity and Congress's certification of the 2020 presidential election results in the midst of an ongoing political dialogue about that election. The President's words might have been "vehement" or "caustic" to some, and they might involve "sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). But the First Amendment protects them all the same.

Instead of "approach[ing] [the plaintiffs'] suggested basis of liability with extreme care," *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 926-27 (1982), the district court found it would be plausible to hold President Trump liable for his speech. The district court grounded its findings not on President

Trump's intent, but on the crowd's reception. And because some crowd members eventually engaged in criminal behavior after the speech, the district court determined that President Trump must have incited them. But this kind of *res ipsa loquitor* philosophy of incitement finds no support in any authority.

## I. The District Court Contorted the Incitement Test.

The Supreme Court recognizes only narrow exceptions to the First Amendment's speech protections. Among those exceptions is advocacy "directed to inciting or producing imminent lawless action" that is also "likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

The test is conjunctive: the speaker's words must be both "intended to produce, *and* likely to produce, imminent disorder." *Hess v. Indiana*, 414 U.S. 105, 109 (1973) (emphasis added). But even with such a clear test, distinguishing political advocacy from incitement is no easy task. "[I]ncitement to disorder is commonly a hair's-breadth away from political 'advocacy'—and particularly from strong protests against the government and prevailing social order." *Counterman*, 600 U.S. at 81 (cleaned up). That thin line is why courts insist that "[s]peakers must specifically intend to incite violence before they lose First Amendment protection." *Id.* at 112 (Barrett,

J., dissenting). And "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 474 (2007).

The district court assumed the President knew the crowd was ready to take action, *Thompson*, 590 F. Supp. 3d at 102, even though "[k]nowing that the crowd was angry was not knowing that they would take criminal measures," *Nicholas v. Wallenstein*, 266 F.3d 1083, 1087 (9th Cir. 2001). And because of this assumed knowledge, the district court found "[i]t [wa]s plausible that" the President's speech was "implicitly directed to incit[ement]," even though "[t]he President's words ... did not explicitly encourage the imminent use of violence or lawless action." *Thompson*, 590 F. Supp. 3d at 115 (cleaned up).

In replacing intent with assumptions, the lower court's reasoning mangles the incitement test in several ways.

### A. Incitement requires intent.

**1.** At least since *Brandenburg*, the Supreme Court has insisted that intent is a necessary component of incitement. "[T]he constitutional guarantee[] of free speech ... do[es] not permit" punishment of speech "except where such advocacy is directed to inciting or producing imminent lawless

action" and is also "likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. Put another way, "words [can]not be punished" unless they "were intended to produce, and likely to produce, imminent disorder." *Hess*, 414 U.S. at 109.

The Supreme Court deliberately installed "[a] strong intent requirement" to "protect mere advocacy of force or lawbreaking from legal sanction." *Counterman*, 600 U.S. at 81. Insisting on that stout standard "was a way to ensure that efforts to prosecute incitement would not bleed over, either directly or through a chilling effect, to dissenting political speech at the First Amendment's core." *Id.* Indeed, "First Amendment vigilance is especially important when speech is disturbing, frightening, or painful, because the undesirability of such speech will place a heavy thumb in favor of silencing it." *Id.* at 87 (Sotomayor, J., concurring in part). So time and again, the Supreme Court has cloaked "dangerous" speech under the First Amendment's protection.

Examples abound. In *Brandenburg*, a Ku Klux Klan leader announced a march on Congress and told a rally of hooded men holding firearms that "there might have to be some revengeance taken" if the government continued to "suppress the white, Caucasian race." 395 U.S. at 446. Despite the armed

crowd of Klansmen, the Supreme Court dubbed the speaker's words "mere advocacy" and held that the "First and Fourteenth Amendments" "condemn[ed]" the statute used to punish that advocacy. *Id.* at 448-49.

In *Hess*, a demonstrator stood in a road being cleared by police and told the people around him to "take the fucking street later." 414 U.S. at 107. He told people *already in* a confrontation that they should engage in lawless action again. The Supreme Court found the statement to be "at worst ...[,] nothing more than advocacy of illegal action at some indefinite future time." *Id.* at 108. So the Court held that "those words could not be punished by the State on the ground that they had a tendency to lead to violence." *Id.* at 109 (cleaned up).

*Claiborne Hardware* involved speech and actual violence. NAACP member Charles Evers instigated a boycott of white merchants in an effort to gain equal rights for black citizens. 458 U.S. at 899-900. During the years-long boycott, "enforcers" of the cause engaged in violence against black individuals who patronized white merchants. *Id.* at 904 n.37. Evers continued to stoke the boycott's flames throughout; he told an audience of supporters to "break" boycott violators' "damn neck[s]." *Id.* at 902. White merchants sued the NAACP for their business losses. *Id.* at 899-90. The Supreme Court set

aside the damages award. It found that Evers's "emotionally charged rhetoric … did not transcend the bounds of protected speech." *Id.* at 928. The white merchants didn't present "evidence—apart from the speeches themselves—that Evers authorized, ratified, or directly threatened acts of violence." *Id.* at 929. And "[m]ere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." *Id.* at 927.

**2.** Measure President Trump's speech against the Supreme Court's incitement cases. Unlike in *Brandenburg*, the President did not tell an armed audience that revenge might have to be taken. Unlike in *Hess*, the President didn't direct an unlawful act. And unlike in *Claiborne Hardware*, the President didn't threaten anyone.

Quite the opposite. The only statement that could be considered an instruction to the crowd was "to peacefully and patriotically make your voices heard." *Thompson*, 590 F. Supp. 3d at 117. And if telling a group responsible for attacks with bricks and guns to break their opponents' necks was "[m]ere advocacy of the use of force or violence" protected by the First Amendment, *Claiborne Hardware*, 458 U.S. at 927, then a generalized metaphor like "fight like hell" must be protected, too, *see, e.g.*, *Million Youth March, Inc. v. Safir*, 63 F. Supp. 2d 381, 391, 396 (S.D.N.Y. 1999) (finding that a speaker's words

were not incitement, even though his admonition to "fight like hell" was accompanied by "hateful, racist, and offensive" statements that even "openly call[ed] for violence").

Put simply, a plaintiff must allege sufficient facts to show an intent to incite before courts open the doors to discovery. That showing is required when the speaker is an ordinary citizen, so at least that much is required when the speaker is the president. Plaintiffs here presented nothing more than President Trump's words spoken to a crowd of angry supporters—the same context the Supreme Court found to be insufficient to show an intent to incite in *Brandenburg*, *Hess*, and *Claiborne Hardware*. And the district court acknowledged that President Trump's words "did not explicitly encourage the imminent use of violence or lawless action." *Thompson*, 590 F. Supp. 3d at 115. So the President's speech wasn't enough by itself, and the context was no different than other cases that didn't cross the incitement threshold. *See United States v. Miselis*, 972 F.3d 518, 538 (4th Cir. 2020) (explaining why speech "urging" others to riot would not constitute non-protected incitement).

**B. Risk awareness isn't enough.**

Awareness of risk cannot substitute for intent. For true threats, recklessness suffices: a speaker may be punished if he "consciously

disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69. Incitement demands more. *See id.* at 99 (Sotomayor, J., concurring in part) (stating that *Claiborne Hardware* "would have come out the other way" had the Court applied "a recklessness rule"). The speaker's words must be "'intended' (not just likely) to produce imminent disorder." *Id.* at 76 (quoting *Hess*, 414 U.S. at 109).

The district court here accepted that rule. It agreed that "merely ignoring a known substantial risk" is "not enough to make out incitement, which requires a heightened mental state," namely "the specific intent to produce imminent disorder." *Lee v. Trump*, No. 21-cv-00400, 2026 WL 880161, at *32 (D.D.C. Mar. 31, 2026).

Still, every one of the district court's findings describes President Trump's supposed risk awareness rather than what he intended. The court found it plausible that he "would have known that some in the audience were prepared for violence." *Thompson*, 590 F. Supp. 3d at 116. It relied on his awareness that supporters had been violent at earlier election-related protests and that militia groups had called for violence. *Id.* at 115-16. On reconsideration, the lower court recounted testimony establishing that he "knew that some supporters in the crowd had weapons and that those weapons

might be used to cause harm, though not to him." *Lee*, 2026 WL 880161, at *33. As best the States can tell, no case *anywhere* has similarly assumed intent from the composition of the crowd in this way.

For good reason: none of these assumed facts go to the President's intent. The district court confused a lone reference to "context" to allow knowledge about an audience's tendencies to serve as a substitute for the speaker's intent. *Lee*, 2026 WL 880161, at *32 (quoting *Counterman*, 600 U.S. at 73, 76). That's wrong. It's true that the Supreme Court said "incitement inheres in particular words used in particular contexts." *Counterman*, 600 U.S. at 76. Ironically, the district court ignored that sentence's context. The Supreme Court made that statement to explain that incitement and "[i]ts harm can arise even when a clueless speaker fails to grasp his expression's nature and consequence." *Id.* In other words, a speaker can incite a crowd even without intending it. But the First Amendment forbids *punishing* a speaker who incites others *unless* he intended it—otherwise the likelihood of imminent lawless action would be the only inquiry that matters. *Id.* ("[T]he First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were intended (not just likely) to produce imminent disorder." (cleaned up)).

The Sixth Circuit rejected liability in a similar scenario, at this same stage, in an incitement case against this same speaker. In *Nwanguma v. Trump*, protestors at a rally "were unceremoniously ushered out after then-candidate Donald J. Trump said, 'Get 'em out of here.'" 903 F.3d 604, 606 (6th Cir. 2018). The protesters "were pushed and shoved by members of the audience as they made their exit" and sought "damages from Trump" for allegedly inciting a riot. *Id.* The court recognized that President Trump's repeated intonation to "get 'em out of here"—spoken to "Trump supporters who were not sympathetic with the protesters"—"may have had a tendency to elicit a physical response." *Id.* at 611-12. But that risk awareness wasn't enough to show incitement. The court instead homed in on President Trump's intent. His words "did not specifically advocate" violence. *Id.* at 612. And his intent was made clear by his other words: "don't hurt 'em." *Id.* That admonition "undercut[]" any "alleged violence-inciting" intent. *Id.*

The speech here contained a similar admonition. President Trump told the crowd to "fight like hell," *Thompson*, 590 F. Supp. 3d at 117, but he also told them "to peacefully and patriotically make [their] voices heard," *id.* The district court discounted President Trump's admonition as "a factor favoring the President." *Id.* And it found that statement to be too remote from "fight

like hell" to bring the speech under the First Amendment's protection. *Id.* But it's hard to see how the district court can derive liability from "context" while ignoring this critical bit of context.

More to the point, this logic again substitutes risk awareness for intent. At best, Plaintiffs' allegations might establish that President Trump knew there was a risk of violence. But President Trump's admonition expressed what he intended—peaceful and patriotic protest. "[P]eaceful march and demonstration [are] protected by the rights of free speech, free assembly, and freedom to petition for a redress of grievances." *Claiborne Hardware*, 458 U.S. at 909. And "the hostile reaction of a crowd does not transform protected speech into incitement." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc); *see also, e.g.*, *Draego v. City of Charlottesville*, No. 3:16-CV-00057, 2016 WL 6834025, at *18 (W.D. Va. Nov. 18, 2016) ("[T]he reaction of listeners is neither a basis to silence the speaker nor reason … to infer that he wished to incite a disturbance."). So the crowd's tendencies and reaction can't supply the basis for President Trump's intent.

### C. Plausibility requires more.

Even taking Plaintiffs' allegations as true, their claim fails at the threshold. Plausibility "asks for more than a sheer possibility that a defendant

has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And where an "obvious alternative explanation" accounts for the conduct, an inference of unlawful purpose is not plausible. *Id.* at 682 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)).

Here, the obvious explanation is the ordinary one. President Trump—like every other political speaker who has used similar rhetoric (more on that below)—didn't intend to call for a literal "fight" at the Capitol. He used "fight" instead as a metaphor for not giving up. That reading is not only *available*, but jives more with the conventional meaning of the words. Where the conventional, lawful meaning of a phrase is the obvious explanation for its use, a district court cannot simply blind itself to that reality, as the district court did here. What's more, even giving the President's comments an *un*favorable reading, they would be more consistent with "[a]bstract advocacy of lawlessness" than a particularized instruction to invade Congress. *United States v. Al-Timimi*, 164 F.4th 292, 303 (4th Cir. 2026) (cleaned up). And the former, again, isn't actionable.

The Speech's fuller context confirms the point once more. Again, President Trump's one express instruction about the march was that the crowd would go to the Capitol "to peacefully and patriotically make [their]

voices heard." *Thompson*, 590 F. Supp. 3d at 117. A speaker who intends to incite an imminent assault does not, in the same speech, direct his audience to proceed peacefully. The district court acknowledged the statement; yet, it set it aside as a "passing reference" made too long before the closing "fight like hell" to color it. *Id.*

The lower court's asymmetry—its refusal to accept one explanation for the words while rejecting other obvious context—is difficult to defend. A direct instruction inside the speech an hour before its close was too remote to matter; yet debate statements from September, *Thompson*, 590 U.S. at 65, rallies from November, *id.* at 83, and tweets from December, *id.*, were close enough to supply an intent to incite. It is hard to understand why a crowd that was so anxious to comply with even *hints* from President Trump would in turn ignore his express wishes and instructions.

The Sixth Circuit ran the same feature in the opposite direction, rightly holding that an express "disavowal and discouragement of violence" within the speech negates the inference that facially innocuous words implicitly called for violence. *Nwanguma*, 903 F.3d at 612. After all, "[i]f words have meaning," an admonition to be peaceful "cannot be reasonably construed" as a call to violence. *Id.* at 608-09. This Court should follow the Sixth Circuit and hold

that President Trump's admonition forecloses any inference of intent to incite. *See also Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017, 1024 (5th Cir. 1987) (finding that an article was protected speech where it "attempt[ed] to dissuade its readers from conducting the dangerous activity it describe[d]").

## II. "Fight" is the ordinary vocabulary of American politics.

Political speech is rough by design. Political language, "like the language used in labor disputes," "is often vituperative, abusive, and inexact." *Watts v. United States*, 394 U.S. 705, 708 (1969). And rhetoric delivered to a crowd "cannot be nicely channeled in purely dulcet phrases." *Claiborne Hardware*, 458 U.S. at 928. As a Nation, we have "chosen to protect unrefined, disagreeable, and even hurtful speech to ensure that we do not stifle public debate." *Nwanguma*, 903 F.3d at 613.

To that end, speech loses protection only if it falls within one of the "historic[al] and traditional categories long familiar to the bar … the prevention and punishment of which have never been thought to raise any Constitutional problem." *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (cleaned up). The Supreme Court includes incitement in the "well-defined and narrowly limited classes of speech" subject to punishment. *Id.* (cleaned up). But using "fight" rhetoric has never been enough to show incitement. Indeed,

battle metaphors have permeated political speech since before the Constitution's ratification.

Start at the Founding. When Samuel Adams aspired to "brushfires of freedom," for instance, he wasn't pushing for early Americans to engage in acts of arson—he was speaking of an idea taking hold. ROBERT D. GINGRICH, FAITH AND FREEDOM: THE FOUNDING FATHERS IN THEIR OWN WORDS 1765 (2012). Thomas Paine condemned war as "let[ting] loose the whole contagion of hell" while simultaneously condemning the "summer solider and sunshine patriot." THOMAS PAINE, COMPLETE WORKS OF THOMAS PAINE 19, 122 (1885) While serving in Paris as a diplomat—far from any real prospect of a fight—Thomas Jefferson stressed how "the tree of liberty must be refreshed from time to time with the blood of patriots [and] tyrants." Letter from Thomas Jefferson to William Stephens Smith (Nov. 13, 1787), *in* 12 THE PAPERS OF THOMAS JEFFERSON 355, 356 (Julian P. Boyd ed., 1955).

Highly charged—even violent—speech has continued since the Founding. Even as he rejected other abolitionists' direct calls to violence, Frederick Douglass still spoke about how slavery "will continue till [it is] resisted with either words or blows, or with both." Frederick Douglass, The Significance of Emancipation in the West Indies, Address at Canandaigua,

N.Y. (Aug. 3, 1857), *in* 3 THE FREDERICK DOUGLASS PAPERS, SERIES ONE 183, 204 (John W. Blassingame ed., 1985). Avowed pacifist William Lloyd Garrison likewise proclaimed he would "not retreat a single inch" in the fight against slavery—and violently dubbed the Constitution "a covenant with death." LEND ME YOUR EARS: GREAT SPEECHES IN HISTORY 686 (W. Safire, ed., 2004).

"Fight" expressions propelled political change, too. Accepting a new party's nomination in 1912, Teddy Roosevelt steeled his supporters for a "great new fight in the never-ending warfare for the good of humankind." Theodore Roosevelt, A Confession of Faith, Address Before the Progressive National Convention (Aug. 6, 1912), *in* 17 THE WORKS OF THEODORE ROOSEVELT 254, 299 (nat'l ed., 1926). Progressive-era reformer Robert M. LaFollette likewise declared that "Progressives … ha[d] just begun to fight" when he lost his race for the presidency. Associated Press, *Just Begun to Fight, Says La Follette*, N.Y. TIMES, Nov. 6, 1924, at A5. Four decades later, Malcolm X told supporters that they were "going to be forced to either use the ballot or the bullet" if things didn't change "real soon." Malcolm X, *The Ballot or the Bullet*, *in* POLITICAL THOUGHT IN THE UNITED STATES: A DOCUMENTARY HISTORY 392, 392 (Lyman Tower Sargent ed., 1997).

.

"Fight" rhetoric is also used in modern politics. In 2008, then-candidate Barack Obama told donors that "[i]f they bring a knife to the fight, we bring a gun." Eugene Kiely, *Obama, Guns and "The Untouchables,"* FACTCHECK.ORG (Jan. 14, 2011), https://perma.cc/V4DA-M9UJ. Three months later, his opponent closed his convention speech with "Fight with me … Stand up, stand up, stand up and fight." *Transcript: John McCain's Speech*, NPR (Sept. 4, 2008, 10:15 p.m.), https://perma.cc/4CVH-4A3D. And just this summer, former President Biden told a crowd that politics is a "battle that's never truly over," and exhorted the crowd to "get up and fight back." *Former President Biden, Gov. Wes Moore and Others Speak at Maryland Democratic Party Gala*, C-SPAN (June 27, 2026), https://tinyurl.com/cstkbsaa.

* * *

That history matters. "From 1791 to the present, the First Amendment has permitted restrictions upon the content of speech" in only "historic[al] and traditional categories." *Counterman*, 600 U.S. at 73 (cleaned up). President Trump's call to "fight like hell" wasn't some demand for violence—it was typical political rhetoric used for centuries. The Supreme Court has refused to expand the categories of unprotected speech. This Court should refuse to

expand the incitement doctrine's reach to gobble up language that has always been in the political lexicon.

### III. The district court's decision will chill speech.

The First Amendment's central worry has never been the speech a court eventually protects; it is the speech that never happens because a speaker fears liability. Political speech needs "breathing space." *Sullivan*, 376 U.S. at 271-72 (cleaned up). The incitement doctrine supplies that space through intent requirements, which exist to keep honest speakers from steering "wide[] of the unlawful zone" out of fear that the legal system will misjudge them. *Counterman*, 600 U.S. at 74-75 (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

The Supreme Court's intent test can (and should) be applied at the threshold to avoid chilling speech. A fact-bound inquiry into accumulated risk awareness, like the one the district court used, cannot. The latter thus promises only the attendant expense and burden of civil litigation, with an uncertain outcome waiting at the end. So applying the wrong test chills speech.

Take a candidate who tells a crowd to fight like hell and then points it toward a courthouse where a contested canvass is underway. The speaker

intends only to draw support to his protest of the election results. But under the district court's reasoning here, he must consider what he knows (or *should* know) about the people in front of him, what those people have done at earlier events, what they've said in recent weeks, and how a court will someday weigh all of it against his own calls for calm protest. The speaker can't answer those questions in advance, so his rational response is to not speak at all.

This chilling effect does not soften when the penalty is monetary damages instead of prison. The First Amendment "precludes punishment, whether civil or criminal," absent intent. *Counterman*, 600 U.S. at 76. Indeed, *Brandenburg*'s incitement test applies with the same force to a tort judgment. *Claiborne Hardware*, 458 U.S. at 927-29. And the Supreme Court hasn't hesitated to bar tort recovery for speech "at a public place on a matter of public concern." *Snyder*, 562 U.S. at 458. Even where it causes severe emotional injury, speech "cannot be restricted simply because it is upsetting or arouses contempt." *Id.*

If anything, civil exposure is worse. The prospect of damages "may be markedly more inhibiting than the fear of prosecution under a criminal statute." *Sullivan*, 376 U.S. at 277. A criminal charge at least requires a decision by an officer who answers to voters, paired with the higher burden of

proof that must be met at trial. A civil claim requires only a complaint and a filing fee—an easy path to impermissibly establishing "government by lawsuit." *United States v. Texas*, 599 U.S. 670, 704 (2023) (Gorsuch, J., concurring) (cleaned up). Under the district court's incitement test, any person affected by a third party's actions following a speech may choose to attack the speaker and erode the First Amendment's protections.

The costs are already substantial. Protest organizers face permit fees, policing fees, cleanup charges, and insurance requirements that "can easily run into the thousands of dollars for even moderately-sized events." Timothy Zick, *The Costs of Dissent: Protest and Civil Liabilities*, 89 GEO. WASH. L. REV. 233, 236 (2021). A family of new civil actions has grown up alongside those costs. Individuals have tried claims for "negligent protest," "riot boosting," and "tortious petitioning." *Id.* at 296. The labels alone are "strongly suggestive of the First Amendment threats they pose"—"ruinous civil liabilities on protest organizers and activists" for speech the First Amendment has always protected. *Id.* Under the district court's formulation of the test, incitement exposure becomes open-ended.

Consider Dr. Martin Luther King, Jr.'s demonstration during the Memphis sanitation workers' strike. That protest turned violent, and

demonstrators looted the city. John Inazu, *Incitement, Enthusiasm, and the Dangers of Negligent Protest*, 6 J. FREE SPEECH L. 801, 824 (2025). On the reasoning the district court used here, "a negligent protest theory might have held King liable for any violence at any future demonstration because he would have been on notice that civil rights movement protests were foreseeably violent." *Id.* That chilling effect may have nixed Dr. King's "I've Been to the Mountaintop" speech just days later. *I've Been to the Mountaintop*, MARTIN LUTHER KING, JR. RSCH. & EDUC. INST., https://perma.cc/QEB3-N2N3 (last visited Sept. 3, 2026).

* * *

"[A] function of free speech under our system of government is to invite dispute." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). Indeed, speech may "best serve its high purpose when it induces a condition of unrest … or even stirs people to anger." *Id.* The Constitution protects free speech, so it necessarily protects "free thought," even—and perhaps especially—"the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654-55 (1929) (Holmes, J., dissenting). Despite how one might feel about President Trump's Ellipse Speech, he had the right to deliver it. It was part of a larger conversation about election integrity that continues to this day. Watering

down the standard that protects that right chills not only President Trump's future speech, but also the speech of all Americans.

## IV. President Trump is Entitled to Immunity.

As it turns out, the district court's decision was doubly wrong. Even if the President's speech falls outside the First Amendment's protection, he is entitled to immunity.

While the First Amendment stands guard against government action that chills speech, the presidential immunity doctrine is intended to prevent lawsuits that chill official action. The "prospect that damages liability may render an official unduly cautious in the discharge of his official duties" is "[a]mong the most persuasive reasons supporting official immunity." *Nixon v. Fitzgerald*, 457 U.S. 731, 752 n.32 (1982). Placing the President in "apprehension that … his official conduct may … become the subject of inquiry in a civil suit for damages … would seriously cripple the proper and effective administration of public affairs." *Id.* at 745 (cleaned up). So the Supreme Court wades into the "President's constitutional responsibilities" with "judicial deference and restraint" in mind. *Id.* at 753.

Presidential immunity is grounded in the Constitution's structure. Liability against "a President for official conduct" threatens "intrusion on the

authority and functions of the Executive Branch." *Trump v. United States*, 603 U.S. 593, 613 (2024). So to avoid clashes between the Executive and the Judiciary, "[s]eparation of powers principles … necessitate at least a *presumptive* immunity from criminal prosecution for a President's acts within the outer perimeter of his official responsibility." *Id.* at 614. And because a court "must balance the constitutional weight of the interest to be served against" intrusion on the Executive, that presumption of immunity should carry more force in a "mere[] private suit for damages based on a President's official acts." *Fitzgerald*, 457 U.S. at 754.

To be sure, "the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President." *Fitzgerald*, 457 U.S. at 753-54. It doesn't "bar a prosecution predicated on the President's unofficial acts." *Trump*, 603 U.S. at 616. The Supreme Court has rejected an immunity defense for conduct that occurred prior to a president taking office. *Clinton v. Jones*, 520 U.S. 681, 684, 694 (1997).

But the Supreme Court has never rejected immunity for the actions of a sitting president. That makes sense. The President "occupies a unique position in the constitutional scheme" as "the only person who alone composes a branch of government." *Trump*, 603 U.S. at 610 (cleaned up). Unique

responsibilities come with "unique risks to the effective functioning of government." *Id.* at 611 (cleaned up). Those risks "arise when the President's energies are diverted by proceedings that might render him unduly cautious in the discharge of his official duties." *Id.* (cleaned up). "[N]eedless worry as to the possibility of damages actions" diverts the "President's attention during the decisionmaking process." *Id.* (cleaned up). And a timider executive hurts the States, as he may be less willing to work in the States' interests, too. So the Supreme Court has held that, so long as the president's actions were "within the 'outer perimeter' of his official responsibility," he is entitled to "absolute Presidential immunity from damages liability." *Fitzgerald*, 457 U.S. at 756.

The "outer perimeter" is broad. It covers the President's "actions so long as they are not manifestly or palpably beyond [his] authority." *Trump*, 603 U.S. at 618 (cleaned up). And courts may not "deem an action unofficial merely because it allegedly violates a generally applicable law." *Id.* at 619.

President Trump's speech falls easily within the outer perimeter of his official responsibility. "The President possesses extraordinary power to speak to his fellow citizens and on their behalf." *Trump*, 603 U.S. at 629 (cleaned up); *accord* Katherine Shaw, *Beyond the Bully Pulpit: Presidential Speech in the*

*Courts*, 96 TEX. L. REV. 71, 73 (2017) ("Presidential speech … is both a central feature of the contemporary presidency and a key tool of presidential governance."). The Supreme Court has "long[]recognized" the "Presidential power" of "the office's 'bully pulpit.'" *Trump*, 603 U.S. at 629. The President speaks from his pulpit "to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Id.* So "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Id.* More to the point, "the President's broad power to speak on matters of public concern does not exclude his public communications regarding the fairness and integrity of federal elections simply because he is running for re-election." *Id.* at 627. After all, "[p]residential *power* is the power to persuade," RICHARD E. NEUSTADT, PRESIDENTIAL POWER 10 (1960), and election reform is a point of real contest right now.

In finding that President Trump failed to establish official-acts immunity at summary judgment, the district court spilled considerable ink wading through the facts. *Lee*, 2026 WL 880161, at *10-29. But the outer-perimeter analysis is more straightforward. Immunity applies if "President Trump's speech … *could* reasonably be understood" to be "official action."

*Blassingame v. Trump*, 87 F.4th 1, 23 (D.C. Cir. 2023) (emphasis added). Conversely, "when a President's actions viewed objectively and in context may reasonably be understood *only* as re-election campaign activity, a court … must deny immunity." *Id.* at 21-22 (emphasis added).

The Ellipse Speech can reasonably be understood to be official action. To state the obvious, Donald J. Trump *was* the President when he delivered the speech. It occurred *after* the 2020 presidential election. He spoke about election integrity and the Vice President's role in certifying the results. ECF 144-2 at 49-52. White House staff vetted the speech. *Id.* at 53-56. And while a non-governmental entity organized the rally, White House officials organized President Trump's involvement in it. *Id.* at 34-36, 41-42. All of that "content, form, and context" point to the act of an official, not a candidate. *Trump*, 603 U.S. at 629 (cleaned up).

At a minimum, President Trump's speech can't be said to have been "manifestly or palpably beyond [his] authority." *Blassingame*, 87 F.4th at 13 (cleaned up). Nor may the speech reasonably be understood *only* as re-election campaign activity. President Trump made a threshold showing of "support to characterize [his] conduct as official." *Trump*, 603 U.S. at 621

(cleaned up). That's enough to invoke immunity—regardless of the Plaintiffs' contrary evidence.

**CONCLUSION**

The Court should reverse.

Respectfully submitted,

JOHN B. MCCUSKEY
ATTORNEY GENERAL

*/s/ Michael R. Williams*
Michael R. Williams
*Solicitor General*
*Counsel of Record*

Caleb B. David
*Deputy Solicitor General*

Mattie F. Shuler
*Assistant Solicitor General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
mwilliams@wvago.gov
cdavid@wvago.gov
mshuler@wvago.gov

Dated: September 9, 2026

C*ounsel for* Amicus Curiae
*State of West Virginia*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

RAÚL LABRADOR
Attorney General
State of Idaho

BRENNA BIRD
Attorney General
State of Iowa

CATHERINE L. HANAWAY
Attorney General
State of Missouri

MICHAEL T. HILGERS
Attorney General
State of Nebraska

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

JAMES UTHMEIER
Attorney General
State of Florida

THEODORE E. ROKITA
Attorney General
State of Indiana

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

DREW WRIGLEY
Attorney General
State of North Dakota

MARTY JACKLEY
Attorney General
State of South Dakota

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 29(a)(5) of the Federal Rules of Appellate Procedure, this amicus brief contains 6,492 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), as required by Rule 29(a)(4), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

*/s/ Michael R. Williams*
Michael R. Williams